# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

OHIO FARMERS INSURANCE )
COMPANY )
        )
        **Plaintiff** )
        )
**v.** )
        )
SPECIAL COATINGS, LLC )
        )
        **Defendant** )
        ) **No. 3:07-1224**
**and** ) **JUDGE ECHOLS**
        )
MILLARD JOEL GODWIN and )
MARILYN K. GODWIN )
        )
        **Defendants/Third Party Plaintiffs** )
        )
**v.** )
        )
WILLIAM CODY RUSSELL, )
WILLIAM C. RIDENOUR, )
WILLIAM MORRISON, and )
MORRISON & FUSON INSURANCE )
AGENCY, INC., )
        )
        **Third Party Defendants.** )

## MEMORANDUM

Ohio Farmers Insurance Company ("Ohio Farmers") filed Plaintiffs' Motion For Summary Judgment (Docket Entry No. 82), to which Defendants Millard Joel Godwin and Marilyn K. Godwin ("Millard" and "Casey" and collectively "the Godwins") filed a response in opposition (Docket Entry No. 87), and Ohio Farmers filed a reply (Docket Entry No. 96). Third Party Defendants William Morrison and Morrison & Fuson Insurance Agency, Inc. (collectively "Morrison"), filed

1

a Motion to Dismiss for Failure to State a Claim (Docket Entry No. 68), to which the Godwins filed a response in opposition (Docket Entry No. 74), and Morrison filed a reply (Docket Entry No. 76). Morrison also filed Third Party Defendants' Motion for Summary Judgment (Docket Entry No. 78), to which the Godwins filed a response in opposition (Docket Entry No. 90), and Morrison filed a reply (Docket Entry No. 93).

This case concerns an effort by a surety company, Ohio Farmers, to recover under a written indemnity agreement executed by Millard individually and as Chief Manager of Special Coatings, LLC ("Special Coatings"), and Casey individually as Millard's spouse. Ohio Farmers issued a bid bond and payment and performance bonds on behalf of Special Coatings so that it could undertake a project to paint a one million gallon water tank for the Hopkinsville, Kentucky Water Environment Authority ("HWEA"). The project was not completed in accordance with bid specifications, and claims were made against the payment and performance bonds.

Ohio Farmers now seeks indemnity from Special Coatings and the Godwins. The Godwins claim that Millard sold Special Coatings to his operations manager, William "Cody" Russell ("Russell"), and Russell's business partner, William C. Ridenour ("Ridenour"), before Ohio Farmers issued the payment and performance bonds on the Hopkinsville project. The Godwins claim that they notified the independent insurance agent who handled the bonds, Morrison, of the transfer of ownership of Special Coatings and that they wanted nothing more to do with Special Coatings. Ohio Farmers claims the Godwins did not notify it in writing of their termination of the indemnity agreement as required by the agreement itself. Morrison contends he did not owe the Godwins a legal duty to send a certified notice letter to Ohio Farmers to relieve the Godwins of their indemnity obligation.

2

Defendant Special Coatings, through counsel, filed an Answer to the Complaint filed by Ohio Farmers. (Docket Entry No. 28). Third Party Defendant Russell also filed an Answer to the Third Party Complaint filed by the Godwins. (Docket Entry No. 29.) On May 6, 2008, this Court permitted counsel for Special Coatings and Russell to withdraw. (Docket Entry No. 38.) Special Coatings did not retain new counsel as instructed, and Russell could not be located. He also did not keep the Court apprised of his current whereabouts and he did nothing to further defend the claims against him. After notice and warning to Russell and Special Coatings on at least two occasions that their failure to appear could result in the striking of their Answers from the docket and entry of default against them, on July 11, 2008, the Magistrate Judge struck the Answers from the record and entered default against Russell and Special Coatings. (Docket Entry No. 64.) On February 29, 2008, the Magistrate Judge stayed all proceedings against Ridenour due to the filing of a Suggestion of Bankruptcy. (Docket Entry Nos. 30 & 31.)

## I. FACTS

In July 2005, Millard sought the assistance of an attorney and formed a limited liability company in Tennessee, Special Coatings, to undertake water tank painting projects. (Docket Entry No. 83-4, Ex. D.) The Articles of Organization initially stated that there were two members of the LLC at the time of formation. (Id.) The Articles were later amended on August 8, 2005 to provide that there was only one member of the LLC, (Docket Entry No. 83-5, Ex. C), and that sole member was Millard. Special Coatings operated out of the Godwins' home on East Piney Road, Dickson, Tennessee.

Millard teamed up with Russell, who was a personal friend with experience in water tank painting. Millard took out a mortgage on a 12-acre piece of commercial property he owned and put

3

$125,000 into the company, in addition to substantial other personal funds and equipment.  Russell agreed to serve as Operations Manager, deciding which jobs to bid, when to bid them, and the amount to be bid for each job.   Casey handled the company's bookkeeping, payroll and bill payments.  (Docket Entry No. 80-6, Marilyn Godwin Depo. at 53.)

In order to obtain a work contract, Special Coatings was required to provide bid, payment and performance bonds to the contracting authority.  Millard went to Morrison to obtain such surety bonds because he had previously been a part owner in a construction company that conducted surety business with Morrison, and he knew Morrison personally.  Previously, the Godwins had executed as co-signors at least one indemnity agreement with a different surety to obtain bonds for the construction company.   (Docket Entry No. 83-3, Ex. C.)  Morrison & Fuson was an independent insurance agency and it had authority by virtue of a power of attorney to write surety bonds for Ohio Farmers.   (Docket Entry No. 96-24, McClanahan Depo. at 31, 57; Docket Entry No. 87-6, McClanahan Depo. at 32.)  The Godwins did not have any kind of contract with Morrison and Fuson.  (Docket Entry No. 80-4, Millard Godwin Depo. at 244.)

On September 7, 2005, the Godwins executed an Agreement of Indemnity in favor of Ohio Farmers at Morrison's office.  (Docket Entry No. 83-1, Ex. A, Indemnity Agreement; Docket Entry No. 83-15, Ex. O, Marilyn Godwin Depo. at 44.)  Millard signed the indemnity agreement as "Chief Manager" of the corporate indemnitor, Special Coatings.   Millard and Casey also signed the agreement as individual indemnitors.  Casey asked Morrison what the document was, and according to her, he said "this was a guaranty that Millard and I were signing for any bonds that Millard signed or I signed for Special Coatings.  If we signed any bonds, we were personally responsible; . . . if the bonding company had to pay out money, Millard and I would be responsible personally for paying

4

this money back to the bonding company." (Marilyn Godwin Depo. at 44-45; Docket Entry No. 90-1, Millard Godwin Aff. ¶ 7.) Millard also understood that if Special Coatings could not pay on a bond obligation, he and Casey would have to pay the debt. ( Docket Entry No. 80-4, Millard Godwin Depo. at 189.) Millard and Casey both testified that they did not read the indemnity agreement before signing it, nor did they ask for a copy at that time. (Id. at 45; Millard Godwin Depo. at 68, 186-187.) Casey testified that she assumed she did not have to read the document and, based on her long relationship with Morrison, she relied on his explanation of what she was signing. (Id. at 45.)

The following provisions of the indemnity agreement are pertinent to the issues:

THIS AGREEMENT entered into by and between the undersigned, herein called Indemnitors, and Westfield Insurance Company, and/or Westfield National Insurance Company, and/or Ohio Farmers Insurance Company all located at Westfield Center, Ohio herein called Surety, witnesseth:

WHEREAS, in the transaction of business certain bonds, undertakings, and other writings obligatory in the nature of a bond have heretofore been, and may hereafter be, required by, for, or on behalf of the Indemnitors or any one or more of the parties included in the designation Indemnitors, and application has been made and will hereafter be made to the Surety to execute such bonds, and as a prerequisite to the execution of such bond or bonds, the Surety requires complete indemnification.

* * *

NOW, THEREFORE, in consideration of the premises the Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

PREMIUMS

FIRST: The Indemnitors will pay to the Surety in such manner as may be agreed upon all premiums and charges of the Surety for the Bonds in accordance with its rate filings, its manual of rates, or as otherwise agreed upon until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

5

## INDEMNITY

SECOND: The Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety, the Indemnitors further agree that in any accounting between the Surety and the Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

* * *

## CHANGES

* * *

NINTH: The liability of the Indemnitors hereunder shall not be affected by the failure of the Principal to sign any such Bond, nor by any claim that other indemnity or security was to have been obtained, nor by the release of any indemnity, or the return or exchange of any collateral that may have been obtained, and if any party signing this Agreement is not bound for any reason, this Agreement shall still be binding upon each and every other party.

## SETTLEMENTS

FIFTEENTH: The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest,

6

costs, expenses and attorneys' fees, including those of the Surety.

* * *

## TERMINATION

TWENTY-THIRD: This Agreement may be terminated by the Indemnitors to be effective twenty days after receipt of written notice by certified mail by the Surety at its home office at Westfield Center, Ohio 44251-5001, but any such notice of termination shall not operate to modify, bar, or discharge the Indemnitors as to the Bonds that may have been theretofore executed. Notice of termination shall operate only with respect to those undersigned upon whose behalf such notice of termination is given.

TWENTY-FOURTH: This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed to form a part hereof.

TWENTY-FIFTH: THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE COMPANY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT OR CO-ADVENTURER), FROM TIME TO TIME, AND OVER AN INDEFINITE PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELED IN ACCORDANCE WITH THE TERMS HEREOF.

(Docket Entry No. 83-1, Agreement of Indemnity at 1, 4 & 5, capitalization in original).

Special Coatings landed two water tank painting projects before the job at issue here: one in Tullahoma, Tennessee, and the other in Rome, Georgia. (Docket Entry Nos. 87-3 & 96-16.) Ohio Farmers issued payment and performance bonds for both projects based on the indemnity agreement with Special Coatings and the Godwins. The Tullahoma project was completed successfully.

By late 2005, the Godwins were having a number of difficulties with Russell, and they were required to invest thousands of dollars to keep the business running. Russell, who had been living at the Godwins' home in Dickson, moved to a Franklin Road address in Brentwood, Tennessee,

7

taking equipment and records of Special Coatings with him. During this time frame, Special Coatings bid on a water tank painting project at Hopkinsville, Kentucky, but all of the bids were rejected, and the project was let for re-bidding.

Around December 24, 2005, Morrison apparently received information from Russell that Millard was going to sell Special Coatings to him. Morrison testified he may have picked up the phone in disbelief and called Millard to find out what was going on. He could not recall if Millard told him he was retiring from the company. (Docket Entry No. 87-9, Morrison Depo. at 53, 55.)

By early January 2006, the Godwins' problems escalated when Russell walked off the job in Rome, Georgia, before the project was complete. Millard contacted Morrison to inform him of the situation. Millard's goal was to persuade Russell to return to the Rome job and complete it so that the Godwins would not be held liable on the payment and performance bonds that Millard had signed for that job. (Docket Entry No. 87-3.) Morrison and Mike McClanahan, bond manager for Ohio Farmers, agreed it would be a good idea to convince Russell to complete the job, and Morrison suggested to Millard that he require Russell to sign a work agreement. (Docket Entry No. 87-9, Morrison Depo. at 74.) Morrison thinks Russell "got mad" at him for "tying him up" in a work agreement, but Morrison's relationship "was with [Ohio Farmers] and Millard and [C]asey." (Id.) Morrison further testified that he did not trust Russell and everything he did "was on the strength of Millard." (Id. at 75.)

On the morning of January 13, 2006, frustrated by the problems with Russell, Casey contacted Millard at the job site in Rome and asked him to return home to Dickson, Tennessee, immediately. Upon his return the same day, Casey told Millard that she wanted no more to do with Special Coatings and Russell, and she did not want Special Coatings to bid for any more jobs,

8

including the project Hopkinsville planned to re-bid. She told Millard she wanted her name taken off the company's bank account, and Millard accompanied her to the bank that day to have her name removed from the account.[2] Millard understood the problems they faced, but he was not entirely in agreement with Casey's approach. Millard wanted to avoid liability on the surety bonds and try to recoup some of the money he had invested in the company.

After leaving the bank, Casey wanted to meet with Morrison to tell him that the Godwins were finished with Special Coatings and Russell. Millard went with her to Morrison's office, but he declined to go inside and sat in the car while Casey went inside to speak to Morrison. Casey told Morrison that she was "done with Special Coatings." She explained that she and Millard had been to the bank to take her name off the business account and to Nextel to establish new business cell phones that were not on her account. She said she wanted her name removed from anything to do with Special Coatings. Morrison explained to her that she and Millard were under the bond for the Rome job, she could not get off that bond; and she and Millard were responsible until the Rome job was finished. (Docket Entry No. 80-6, Marilyn Godwin Depo. at 60-61.) Casey told Morrison she and Millard would complete the Rome job and as soon as that was done, she and Millard were out of the tank painting business. (Id.) Casey further told Morrison there was no need for any more bonding after the Rome job was finished. She informed him, "[w]e are done with that completely. And whatever you have to do to get me out and my name off of this company or off of it, do it." (Docket Entry No. 87-5, Marilyn Godwin Depo. at 198.)

Casey knew that, other than Rome, Georgia, there were no other jobs pending. She

---

[2]However, Casey wrote at least four checks on the business account in April 2006, after she claimed to have removed her name from the bank account. (Docket Entry No. 80-3, Ex. 21.) Millard closed the bank account in early 2007. (Docket Entry No. 80-3, Ex. 19.)

9

specifically mentioned to Morrison the Hopkinsville job because she knew all of the bids had been rejected and that project would have to be re-bid. Casey explained to Morrison that "we're not doing anymore jobs. I'm done." (Id. at 64.) Casey knew that the indemnity agreement she and Millard signed would have applied to the Hopkinsville job when Special Coatings first bid that job, but the bid was rejected and thereafter she felt the indemnity agreement did not apply because she told Morrison she and Millard were not doing any more jobs with Special Coatings. (Id. at 199.)

Morrison did not provide Casey with any document to sign to remove her name from the indemnity agreement. (Id. at 204, 215.) Millard did not ask Casey to get his name removed from the indemnity agreement; Millard has never asked Casey about having his name removed from the indemnity agreement. (Id. at 210.) Neither Casey nor Millard sent a written notice to Ohio Farmers by certified mail to terminate their liability under the indemnity agreement.

On February 9, 2006, Millard and Russell signed a work agreement requiring Russell to work for Special Coatings as a painter and to devote his full business time and attention to the business and affairs of Special Coatings. The agreement provided that Russell would maintain employment and continue providing services until completion of any and all projects entered into or contracted by Special Coatings. (Docket Entry No. 83-17, Ex. O.) Another provision provided:

> 4. Compensation. As compensation for all services to be rendered by Russell hereunder, Special Coatings agrees to obtain and/or secure performance and/or construction bonds in order to secure projects that Russell will be working on. In addition, Special Coatings agrees to pay to Russell an amount to be determined on a case-by-case basis.

(Id. at 1.) The work agreement also precluded Russell from assigning the work agreement and benefits under it to others, but Special Coatings could assign the agreement and benefits under it automatically "to any person, firm or corporation acquiring all or substantially all of the assets of

10

Special Coatings or to any corporation into which Special Coatings may be merged or consolidated," subject to Russell's right to terminate the agreement as provided in the agreement. (Id. at 3.) The record is not clear as to who drafted the work agreement.

In this same time period, it appears that Millard discussed with Russell selling Special Coatings to him, and Russell would continue the water tank painting business with William Ridenour, either by continuing as Special Coatings or as a new venture with Ridenour called Aqua Technologies. Morrison testified that he did not know the extent of Ridenour's involvement in Aqua Technologies, and when asked, "do you recall if Special Coatings was ever owned by William Ridenour or Cody Russell?" Morrison answered, "I couldn't tell you what they owned. . . . Before I believed anything I would talk to Millard." (Id. at 84.) Morrison also testified, however, that he had a conversation with Ridenour and learned that Ridenour owned ninety percent (90%) and Russell owned ten percent (10%) of Aqua Technologies. (Docket Entry No. 87-9, Morrison Depo. at 62, 84.) Morrison looked at the possibility of bonding Aqua Technologies, apparently for the job in Kentucky in the amount of $393,000, although Morrison testified he did not know if Aqua Technologies submitted an application requesting bonding for a $393,000 job. (Id. at 93.) Morrison later acknowledged there was such an application by Aqua Technologies, and Millard's name was nowhere on it. (Id. at 95.) Morrison received only some of the information he requested from Aqua Technologies, and he felt the financial information sent to him by Aqua Technologies' CPA was "worthless" and not verifiable. Morrison sent the financial statement supplied by Ridenour to the surety underwriters at Ohio Farmers for them to make a decision about whether Aqua Technologies qualified for bonding. Morrison relayed this information about Aqua Technologies to Millard. (Id. at 60, 90-91, 102.) Morrison did not think "there was anything there"

11

to permit bonding of Aqua Technologies. He "felt like Millard had too much to lose, but I just didn't see any real money." (Id. at 95.)

The same day Millard and Russell signed the work agreement, February 9, 2006, Ohio Farmers issued a bid bond on behalf of Special Coatings to accompany the bid schedule for a contract with HWEA to paint a 1 million gallon water storage tank in Hopkinsville. (Docket Entry No. 83-6, Ex. F.) Special Coatings was shown as the "Principal," but the bid bond was not signed by Millard, Russell, or anyone else for the "Principal."[3] Millard denied that he ordered or approved the bid bond for Special Coatings, despite the terms of the work agreement with Russell dated the same day. If Morrison had called Millard on February 9 immediately before issuing the bond, Millard would have told Morrison not to issue the bond. Millard testified he thought the bid bond would issue in the name of Aqua Technologies, but he also testified that he knew Russell and Ridenour could not get bonded through Aqua Technologies. Millard also acknowledged that he knew the indemnity agreement was still in force at the time the bid bond was issued. (Docket Entry No. 87-7, Millard Godwin Depo. at 235.) Millard wanted Russell and Ridenour to get the Hopkinsville contract because he thought he would recoup some of his investment in Special Coatings from that job. (Id. at 229, 235; Docket Entry No. 80-4, Millard Godwin Depo. at 224, 289,

---

[3]At various points in the briefs, comments are made that Millard's signature on the bid bond was a forgery. As just stated, Millard did not sign the bid bond. The Court believes the parties refer to the bid schedule submitted to the HWEA as an attachment to the bid bond. (Docket Entry No. 96-15.) Russell signed the bid schedule as "Operations Manager" for Special Coatings, and below Russell's signature appears: "ATTEST (For Corporations) and what purports to be a signature of Millard Godwin as "Owner." Millard flatly denied that the signature on the bid schedule is his and said it was a forgery and "not even close." (Millard Godwin Depo. at 76; Docket Entry No. 90-1, Millard Godwin Aff. ¶ 8.) Casey also stated she was familiar with her husband's handwriting, and the signature on the bid schedule was not Millard's, but a forgery. (Docket Entry No. 90-2, Marilyn Godwin Aff. ¶ 2.) For purposes of summary judgment, the Court must take these representations as true.

309, 324.)

Morrison testified that Millard requested the bid bond because if Russell had called Morrison asking for the bond, Morrison would have contacted Millard.[4] (Docket Entry No. 87-9, Morrison Depo. at 72.) Morrison also testified that he received a telephone call from Millard and Millard wanted to allow issuance of the bid bond because there was money to be made and "[t]his would clean up the debt structure." (Id. at 95-96.) Morrison did not want to issue the final payment and performance bonds on the Hopkinsville job unless Ohio Farmers was "fully aware of things." (Id.) Morrison knew the job would bid in the name of Special Coatings, but he claimed he did not know where Aqua Technologies fit into the situation. (Docket Entry No. 96-23, Morrison Depo. at 96.) As far as Morrison knew, Millard came to the office to pick up the bid bond and signed it because "somebody had to sign the bond." (Id.)

Thomas Fuson of the Morrison & Fuson agency signed the bid bond on behalf of Ohio Farmers.[5] The bid bond obligated Ohio Farmers as surety to pay ten percent (10%) of the bid amount of $396,000.00, or $36,900.00. The purpose of the bid bond was to assure HWEA that, if Special Coatings was awarded the contract for the project, Special Coatings would enter into the contract and furnish the required payment and performance bonds. Millard admitted that he was the sole owner of Special Coatings when the bid bond was issued. (Docket Entry No. 80-1, Millard Godwin Depo. at 76.)

---

[4]The Godwins subpoenaed Millard's cell phone and home telephone records, but there was no evidence in those records that Morrison called Millard at this time. (Docket Entry No. 90-2, Marilyn Godwin Aff. ¶ 1.)

[5]Morrison explained that Fuson may have signed the bond instead of him because the project was in Kentucky, and Fuson had a license in that state.

13

HWEA's list of "Pre-Qualified Contractors" to paint the water tank, dated February 9, 2006, included Aqua Technologies, LLC, but did not include Special Coatings, LLC. (Docket Entry No. 96-17.) HWEA's Bid Tabulation for the painting project, also dated February 9, 2006, listed Special Coatings, LLC of Dickson, Tennessee, as the low bidder at $396,000.00. (Docket Entry No. 96-18.) On February 24, 2006, HWEA sent a letter addressed to Special Coatings, LLC/Aqua Technologies, LLC, to the attention of Russell at the East Piney Road address where the Godwins resided. In the letter, HWEA accepted Russell's low bid and awarded the Hopkinsville painting job. (Docket Entry No. 83-8, Ex. H.)

The next day, on February 25, 2006, Millard assigned all of his right, title and interest in Special Coatings to Russell. (Docket Entry No. 83-16, Ex. P.) Millard and Casey considered this a sale of Special Coatings to Russell. Among other things, the agreement provided that Russell would assume all debts accrue[d] by the company "from this date forward[,]" and Millard would be "solely responsible for all debts, claims or liens accrued by the company prior to signing this agreement." (Id. at 1.) The parties also agreed that "any former written or verbal agreements between the two parties prior to this contract will from this date forward be null and void." (Id. at 2.) Both Millard and Russell signed the agreement; Millard testified Russell handed it to him to sign while they were working on the Rome job site. (Id.; Millard Godwin Depo. at 95.) Millard testified that he told Russell to stop bidding on jobs for him. (Docket Entry No. 80-1, Millard Godwin Depo. at 88.) Even though Millard sold the company to Russell, he still paid bills after the sale for debts incurred before the sale. (Docket Entry No. 87-7, Millard Godwin Depo. at 238.) Millard acknowledged that the agreement assigning his rights in Special Coatings to Russell was silent on whether Millard terminated his obligation under the indemnity agreement with Ohio Farmers.

14

(Docket Entry No. 83-2, Ex. B, Millard Godwin Depo. at 177-78.)

Russell gave a copy of the written agreement assigning Special Coatings to him to Morrison. (Docket Entry No. 80-1, Millard Godwin Depo. at 102.)  According to Millard, Russell sent the agreement to Morrison to show he owned the company and to get insurance.  (Id.)  Morrison then sent the agreement by fax to surety underwriters Mike McClanahan and Timothy Basch at Ohio Farmers.  The fax cover sheet stated in Morrison's handwriting:

> Dear Tim & Michael:
>
> As we discussed last Friday Millard Godwin is thinking about selling Special Coatings, Inc. to William C. Ridenor.  (sic) I have enclosed [to]  you a copy of his financials for you to review ASAP.  The managing company would be called Aqua Technologies, LLC.  Their address is 512 Leicester Court, Franklin, Tennessee 37067. I told Mr. Ridenor (sic) that we would need some funds put into the company and I have requested a CPA compilation report including the balance sheets.  I am not sure how all of this will effect (sic) the bid bond for the Hopkinsville job, but we both know there needs to be some agreements changed prior to releasing any final bonds.  Please call me when you have a chance to discuss!
>
> Sincerely,
> Will

(Docket Entry No. 80-5, Ex. 25; Docket Entry No. 87-9, Morrison Depo. at 87-88.)  Morrison testified he had no idea what the agreement was; to him it looked like Millard was "assigning rights . . . where he doesn't show up anywhere maybe.  It's like he's trying to transfer something." (Docket Entry No. 96-23, Morrison Depo. at 82.)  Morrison denied that he had any role in preparing the assignment agreement, and he did not know who did.  (Id.)  Later in his deposition, Morrison testified he thought Ridenour was buying Special Coatings, but he could not be totally sure if Russell was involved.  (Id. at 90.) Morrison recalled he had a conversation with Basch in which they discussed  Millard's assignment  of Special Coatings.  Morrison told Basch that "our relationship is with Millard.  And, bottom line, if Millard's out, we're out."  (Id. at 87.)   When Morrison was

15

asked to identify the agreements he was referring to in the last sentence of his fax cover page, Morrison testified, "I was discussing the agreement and indemnity agreement." He explained he discussed with the underwriters making some changes in the indemnity agreement "if we could verify who owned what." (Id. at 88.)

Bond manager Mike McClanahan testified that he received the fax from Morrison which attached the Special Coatings assignment agreement between Millard and Russell, and he discussed the agreement with Morrison. (Docket Entry No. 87-6, McClanahan Depo. at 35.) According to McClanahan, Morrison "was letting us know that Millard was thinking about selling his company." (Id.) McClanahan claimed he did not know what agreements Morrison was referring to when he wrote on the fax cover sheet: "I'm not sure how all of this will effect (sic) the bid bond for the Hopkinsville job, but we both know there needs to be some agreements changed prior to releasing any final bonds." (Id. at 35-36, 38-39.) At one point McClanahan testified that Morrison was referring to agreements to provide bonding, and he stated that the subject of indemnity agreements in reference to agreements between the parties prior to releasing final bonds never crossed his mind. (Id. at 36, 39.) McClanahan further testified that Ohio Farmers had no intention of bonding Ridenour or doing future bid bonds with Special Coatings. (Id. at 45, 52.)

Upon reading the assignment agreement between Millard and Russell, McClanahan did not see any reference to the indemnity agreement Millard and Casey had signed in favor of Ohio Farmers. If there had been a reference to the indemnity agreement, such a reference would have raised a "red flag." McClanahan did not call Millard or Russell about the agreement. He did not receive a request from the Godwins to release their indemnity. He stated that Ohio Farmers was writing bonds for the Special Coatings account because of the indemnity of Millard and Casey, and

if he had received a request from the Godwins to release their indemnity, that would have made a difference in his decision to write the payment and performance bonds. (Id. at 79; Docket Entry No. 96-24, McClanahan Depo. at 78; Docket Entry No. 90-4, McClanahan Depo. at 42.) McClanahan agreed with Basch that Ohio Farmers "still had the indemnity of Millard" for the final bonds. (Docket Entry No. 96-24, McClanahan Depo. at 78.)

McClanahan also received an email (although it is not clear from whom) informing him that Ridenour, Russell and Millard were all going to be involved in the business together and they planned to set up a partnership agreement, but McClanahan never saw a copy of such a partnership agreement. (Id. at 52.) Millard denied that he entered into a partnership agreement with Ridenour and Russell. Millard also claimed that a letter Russell wrote to the surety claiming that Ridenour, Russell and Millard were equal partners in Special Coatings pursuant to an agreement dated February 24, 2006 was a misrepresentation, and Millard stated he did not know about Russell's letter. (Docket Entry No. 80-1, Millard Godwin Depo. at 57-58; Docket Entry No. 80-2.) Millard felt Russell wrote the letter to make Morrison think Millard was still a partner so Morrison would issue bonds. (Docket Entry No. 80-4, Millard Godwin Depo. at 326.)

Surety underwriter Basch, like McClanahan, claimed he did not know what agreements Morrison was referring to in his fax cover page, but when pressed, he thought Morrison meant the indemnity agreement executed by the Godwins. To his knowledge, the indemnity agreement was never changed. (Docket Entry No. 87-8, Basch Depo. at 25.) In an email he wrote to Morrison thirty minutes after receiving Morrison's fax attaching Millard's agreement with Russell to assign Special Coatings, Basch thought another surety should underwrite the account. He also asked about the purchase price for Special Coatings and told Morrison, "We appreciate your prompt notice of

17

the changed conditions." (Id. at 37.)  When asked what the changed conditions were, Basch responded, "That Millard was having additional people help around the company." (Id. at 37-38.)

Morrison testified he received a request from Millard to issue the final bonds on the Hopkinsville project.  Morrison told Millard that he knew Ridenour and Russell had tried to get bonded with Ohio Farmers through another agency and were denied.  Morrison told Millard he would do the final bonds for him, and the reason he did so was because Ohio Farmers had already issued the bid bond.  (Docket Entry No. 90-5, Morrison Depo. at 66.)

Morrison called McClanahan and relayed Millard's sentiments to McClanahan.  Morrison was not going to write the final bonds unless McClanahan was "okay with it."  Morrison pointed out that Ohio Farmers could write the final bonds and take a risk on them or not write the bonds and lose 10% on the bid bond, or $39,600.00.  Morrison deferred to McClanahan to make the decision.  They discussed again that financial strength was not with Ridenour or Russell, but with Millard.  (Docket Entry No. 96-23, Morrison Depo. at 96.)

On March 7, 2006, Morrison exchanged emails with Basch at Ohio Farmers.  Morrison told Basch, "I will not do any bid bonds or final bonds until the situation is resolved." (Docket Entry No. 87-9, Morrison Depo. at 91.)  Morrison testified he was referring to the fact that he and Ohio Farmers had not received the financial information from Aqua Technologies that was requested and there was no verification on anything concerning Ridenour.

On March 30, 2006, Morrison, acting for Ohio Farmers, issued a payment bond and a performance bond, each in the penal sum of $396,000.00, for the Hopkinsville project on behalf of Special Coatings using the Brentwood, Tennessee address associated with Russell.  (Docket Entry Nos. 83-9 & -10, Exs. I & J.)   The bonds were prepared for Russell to sign on behalf of Special

18

Coatings as "Principal," but Russell, Millard, Ridenour nor anyone else signed the bonds on behalf of Special Coatings. Thomas Fuson signed the bonds on behalf of Ohio Farmers. Like the bonds for the Rome, Georgia job, the bonds had powers of attorney attached to them in which Ohio Farmers named the Morrison and Fuson agency as its agent.

Millard testified Russell called him on March 30, 2006 to tell him Ridenour was going to Morrison's office to pick up the final bonds. Millard further testified that he drove over to Morrison's office shortly thereafter to be sure his name was not on the bonds. He thought someone had to sign the bonds, and he was not going to do it. Ridenour was there and picked up the bonds. Millard watched as the secretary handed the bonds to Ridenour. Millard did not hold the bonds or look closely at them. When the secretary asked Ridenour for the premium payments, he told her he would write a check the next day. Millard did not say anything to anyone at the Morrison agency that day or any other day about the indemnity agreement he had signed, nor did he ask Morrison's advice. He did not tell Morrison that his indemnity would not stand behind the bonds. When Millard sold Special Coatings to Russell, Millard thought he was out of it, and he believed Morrison should have taken him off of the indemnity agreement at that time. Millard never saw a document from Ohio Farmers telling him he was relieved of any further obligation for the bonds under the indemnity agreement. He attests that, after he sold his interest in his prior construction company, he relied on Morrison to remove his name from all future surety bonds and indemnity agreements. (Millard Godwin Aff. ¶ 9.) Millard still held himself out as the President of Special Coatings on May 9, 2008, when he signed documents submitted to the Internal Revenue Service through his CPA. (Docket Entry No. 80-1, Millard Godwin Depo. at 100-102, 158-160; Docket Entry No. 80-4 at 243, 245-246, 307, 330; Docket Entry No. 80-5, Ex. 39.)

19

Meanwhile, Russell had not finished the Rome, Georgia job. The Godwins performed work to finish that job sometime in April or May of 2006. The Godwins completed the project so they would not be held liable on the payment and performance bonds issued by Ohio Farmers.

Russell failed to complete the Hopkinsville project in accordance with the terms of the March 30, 2006 contract he signed with HWEA on behalf of Special Coatings. (Docket Entry No. 96-20.) On November 1, 2006, HWEA terminated Special Coatings' right to complete the project and filed a claim against the performance bond. (Docket Entry No. 83-7, Ex. G, Hale Depo. at 75). Numerous claims also were made on the payment bond by unpaid suppliers of labor, material and equipment. (Docket Entry Nos. 83-11 to 83-14, Exs. K-N.)

Ohio Farmers, through its Senior Bond Claim Counsel, Anne Stith, investigated the claims.[6] (Docket Entry No. 83-18, Stith Depo. at 171-172.) Ms. Stith learned while processing the claims that Special Coatings had allowed its Tennessee organization as a limited liability company to expire on November 15, 2006 (Docket Entry No. 96-19), Ridenour had organized Special Coatings as a Nevada limited liability company on May 24, 2006 (Docket Entry No. 96-21), and by December 2006 Ridenour and Russell were both reporting they were the only owners of Special Coatings. (Docket Entry No. 87-4, Stith Depo. at 29-31.) On April 25, 2007, Ohio Farmers settled HWEA's claim on the performance bond for $175,000.00, although that sum was not enough for HWEA to complete the project. (Hale Depo. at 75-76.) Ohio Farmers rejected some of the claims on the payment bond, but paid $45,105.50 to settle claims on the payment bond. Ohio Farmers also established a reserve of $125,000.00 to cover future potential losses and expenses arising from the

_____

[6]While the Godwins contend that Ms. Stith did not properly investigate or settle the claims against the bonds fairly, the Godwins offer no evidence in support of their assertion.

payment bond. Ohio Farmers paid a consultant $2,045.00 to investigate the claim against the performance bond (Docket Entry No. 83-14, Ex. N), and Ohio Farmers represents it has incurred attorney's fees and litigation expenses of approximately $75,000.00 as of the filing of the summary judgment motion.

Under the indemnity agreement, Ohio Farmers demanded indemnity from Special Coatings and the Godwins and the deposit of additional collateral with respect to claims which remained outstanding against the payment bond (Docket Entry No. 83-19, Ex. S), but the Godwins did not respond to the demand. This lawsuit followed. The Godwins have sold their home in Dickson and now reside in Florida.

Ohio Farmers seeks declaratory judgment that the Godwins and Special Coatings, pursuant to the indemnity agreement, owe Ohio Farmers for the entire amount paid to satisfy claims against the payment and performance bonds. Ohio Farmers also seeks enforcement of the collateral security provision of the indemnity agreement. In addition, Ohio Farmers seeks recovery of costs and expenses, including attorney's fees, nontaxable expenses, and prejudgment interest.

In answer to the Complaint, the Godwins raised a number of affirmative defenses. They also raised as an affirmative defense the comparative fault of Ohio Farmers and its agents, William Morrison and Morrison & Fuson Insurance Agency; however, the Godwins did not file a counterclaim for negligence against Ohio Farmers, and the Complaint sounds only in contract. The Godwins also included in their Answer to the Complaint a "cross-claim," more accurately denominated a third-party complaint, against William Russell and William Ridenour for contribution and breach of a warranty in the assignment/sale agreement.

In a separate Third Party Complaint, the Godwins sued William Morrison and Morrison &

21

Fuson Insurance Agency, Inc. for negligence, alleging they acted as dual agents for the Godwins and Ohio Farmers, and seeking contribution for any amounts the Godwins are found to owe Ohio Farmers. The Godwins alleged that Morrison and the agency were negligent in issuing the payment and performance bonds and in failing to make further inquiry of the Godwins' role in Special Coatings at the time the bonds were issued. Further, at the time the bonds were issued and delivered to Ridenour, Morrison knew or should have known that the Godwins had no material or beneficial interest in the bonds issued to Special Coatings.

## II.  STANDARD OF REVIEW

In evaluating Morrison's motion to dismiss the Third Party Complaint for failure to state a claim under Rule 12(b)(6), the Court must accept as true all of the Godwins' allegations and resolve all doubts in their favor. See Morgan v. Church's Fried Chicken, 829 F.2d 10, 11-12 (6th Cir. 1987). While a complaint need not contain detailed factual allegations, the Godwins must provide the grounds for their entitlement to relief, and this "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. —, 167 L.Ed.2d 929, 940 (2007) (abrogating Conley v. Gibson, 355 U.S. 41 (1957)).  The factual allegations supplied must be enough to show a plausible right to relief. Id. at 940-942.  A complaint must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory. Id. at 944; Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988).

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).

The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. ANALYSIS

### A. Morrison's Motion to Dismiss under Rule 12(b)(6)

Morrison requests dismissal of the Godwins' Third Party Complaint on the ground that the third-party action is improper under Federal Rule of Civil Procedure 14. Because the liability of Morrison is not derivative of, or secondary to, the Godwins' contractual liability to Ohio Farmers under the indemnity agreement, Morrison contends the Third Party Complaint must be dismissed for failure to state a claim.

23

Rule 14(a)(1) provides in pertinent part: "A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Although Rule 14(a) was designed to promote judicial economy, the right to implead third parties is not automatic, and the decision whether to permit impleader rests within the sound discretion of the Court. See Doucette v. Vibe Records, Inc., 233 F.R.D. 117, 119-120 (E.D.N.Y. 2005).

Third-party pleading is appropriate "where the third-party defendant's liability to the third-party plaintiff is dependent on the outcome of the main claim; one that merely arises out of the same set of facts does not allow a third-party defendant to be impleaded." American Zurich Ins. Co. v. Cooper Tire & Rubber Co., 512 F.3d 800, 805 (6th Cir. 2008). The hallmark of a third-party claim is the attempt of the defendant to transfer the liability asserted against it by the original plaintiff to the third party defendant. See id. The claim against the third party defendant cannot be simply an independent or related claim, but must be based upon the original claim of the plaintiff against the defendant. See id.; Unilease Computer Corp. v. Major Computer Inc., 126 F.R.D. 490, 492 (S.D.N.Y. 1989). "Rule 14(a) does not allow a third-party complaint to be founded on a defendant's independent cause of action against a third-party defendant, even though arising out of the same occurrence underlying plaintiff's claim, because a third-party complaint must be founded on a third party's actual or potential liability to the defendant for all or part of the plaintiff's claim against the defendant." American Zurich Ins. Co., 512 F.3d at 805. The third party complaint must be in the nature of indemnity, contribution, or subrogation. Id.; Doucette, 233 F.R.D. at 120.

Applying these principles here, Rule 14(a) impleader is limited to a claim where the Godwins can show that, if they are found liable to Ohio Farmers on the indemnity agreement, then Morrison

24

will be liable to them. See Doucette, 233 F.R.D. at 121. But this is not what the Third-Party Complaint alleges. The Godwins do not allege that Morrison is secondarily liable to them to satisfy Ohio Farmers' indemnity claim. Rather, the Godwins assert an independent cause of action against Morrison for negligence, claiming that, but for Morrison's negligence, the indemnity agreement would have been terminated and Ohio Farmers could not have sued the Godwins on that agreement. The Godwins' negligence claim against Morrison is certainly related to Ohio Farmers' narrow contractual indemnity claim, but the negligence claim, if proven, would not make Morrison derivatively liable to Ohio Farmers. The Godwins' Third-Party Complaint does not allege how Morrison's conduct would have obligated Morrison to Ohio Farmers in any manner. GE Healthcare Fin. Servs. v. EBW Laser, Inc., 225 F.R.D. 176, 178, 180 (M.D. N.C. 2004).

Further, although the Godwins assert a claim of contribution against Morrison, the doctrine of contribution is not founded on contract law and applies where parties share a common obligation or liability, but one party has paid more than its proper share of the obligation. Squibb v. Smith, 948 S.W.2d 752, 754 (Tenn. Ct. App. 1997); Stiver Mktg., Inc. v. Performance Business Forms, Inc., 1991 WL 254564 at *3 (Tenn. Ct. App. Dec. 4, 1991) ("A person who, in whole or in part, has discharged a duty which is owed to him but which, as between himself and another, should have been discharged by the other, is entitled to indemnity from the other unless barred by the wrongful nature of his own conduct."). "The right to contribution among contract debtors does not arise until one of them actually pays more than its fair share of the joint obligation." Id.

"The ingredient for contribution that is missing in this case is the existence of a common obligation." First Nat'l Bank v. Cumberland Bend Investors, L.P., 2002 WL 31835693 at *4 (Tenn.

25

Ct. App. Dec. 19, 2002). The Godwins and Morrison do not have a common obligation to indemnify Ohio Farmers for paying the claims made under the performance and payment bonds. Thus, the Godwins have no basis upon which to request contribution from Morrison. See id. The only claim Ohio Farmers asserts is the Godwins' contractual liability on the indemnity agreement, and the Godwins cannot pass that indemnity liability to Morrison by raising an independent claim of negligence against Morrison that could be pursued in a separate case. See Siemens Westinghouse Power Corp. v. Dick Corp., 299 F.Supp.2d 242, 248-249 (S.D.N.Y. 2004) (holding attempted third-party practice under Rule 14 improper where issue whether third-party defendant committed contract breaches or torts affecting ultimate apportionment of liquidated damages was not contingent in any way on narrow question presented in plaintiff's complaint); Republic Nat'l Bank v. Hales, 75 F.Supp.2d 300, 310 (S.D.N.Y. 1999) (holding impleader under Rule 14 improper where claims of fraud, breach of fiduciary duty and the like against third-party defendant were not dependent upon third-party plaintiff's ultimate liability to plaintiff).

Cases cited by the Godwins can be distinguished from the situation here. In American Zurich, 512 F.3d 800, a commercial excess liability insurer filed an action for declaratory judgment against a primary liability insurance carrier and the insured, Cooper Tire, to seek a declaration that defense costs were improperly applied to deplete the primary liability carrier's coverage limit. Id. at 801. Cooper Tire filed a third-party action against its long-time broker, Marsh U.S.A., Inc., claiming negligence, breach of contract and breach of fiduciary duty. Cooper Tire predicated Marsh's alleged liability on a finding in the underlying action that Endorsement 17 was valid. Cooper Tire alleged that Marsh added Endorsement 17 to the policy without Cooper Tire's knowledge and permission. Cooper Tire alleged that, if the court found Endorsement 17 to be valid,

26

then Marsh was liable because it breached its contractual and fiduciary duties to Cooper Tire. Id. at 802-803. Although the case does not expressly say so, it appears that Cooper Tire and Marsh were in privity of contract as insured and agent, while in this case, the Godwins did not have a contract with Morrison. Cooper Tire sought to hold Marsh liable to American Zurich in the place of Cooper Tire. Here, the Godwins asserted no facts under which Morrison could be held liable to Ohio Farmers on the indemnity agreement in lieu of the Godwins.

In Garland v. TVA, 336 F.3d 455 (6th Cir. 2003), plaintiff workers who allegedly were exposed to asbestos sued their employer, independent contractor Triangle Enterprises, Inc., for strict liability, negligence, breach of implied warranty, failure to warn, and failure to follow safety guidelines. Triangle in turn sued TVA in a third-party complaint for apportionment of fault based on allegations that TVA distributed and installed asbestos products at its work site. Triangle also sought indemnity from TVA, alleging it was negligent in failing to provide a safe place of employment and safeguards necessary to protect employees, that any negligence on Triangle's part was secondary and passive, and that the active and primary negligence was TVA's. Id. at 457. Again, although the case does not make the point explicit, it appears that Triangle and TVA were in privity of contract. The case was decided under Kentucky law and is a classic example of contribution and indemnity claims between joint tortfeasors. Here, Ohio Farmers did not bring a tort claim against the Godwins, and Morrison was not a joint tortfeasor with the Godwins as against Ohio Farmers.

The case of Kane v. Magna Mixer Co., 71 F.3d 555 (6th Cir. 1995) is distinguishable for similar reasons. There a worker was injured using a 40-year old industrial mixer and sued the

manufacturer for product liability.  Id. at 558.  The manufacturer had sold out to a competitor and

had a contractual indemnity agreement with the successor.  Plaintiff obtained a default against the

manufacturer and the manufacturer assigned its contractual indemnity claim against the successor

to the plaintiff.  Id. at 558-559.   Because the manufacturer's indemnity claim was a compulsory

counterclaim that was not raised in plaintiff's prior litigation, the court ruled that plaintiff could not

proceed against the successor.  Id. at 558-563.  The case is inapposite to the circumstances presented

here.

Finally, Lasa Per L'Industria Del Marmo Societa Per Azioni of Lasa, Italy v. Alexander, 414

F.2d 143 (6th Cir. 1969) is also distinguishable.  The case involved the construction of a new city hall

in Memphis and was decided many years before Tennessee largely abrogated implied indemnity and

contribution in McIntyre v. Balentine, 833 S.W.2d 52, 58 (Tenn. 1992).  In Lasa, an Italian marble

supplier sued the primary contractor, a subcontractor and a surety for the balance due on its supply

contract.  The subcontractor filed a third-party complaint against the architect on the project, who

was under contract to perform professional services to the City of Memphis.  Lasa, 414 F.2d at 145-

147.   The multiple contractual relationships between the parties in that case distinguish it from the

case here, where the Godwins were in contractual privity only with Ohio Farmers, and not with

Morrison.

As discussed above, the Godwins' Third-Party Complaint against Morrison was improperly

filed under Rule 14, and Morrison's motion to dismiss the Third-Party Complaint under Rule

12(b)(6) will be granted.  It is unnecessary for the Court to address Morrison's alternative arguments

in support of the motion to dismiss that the doctrines of contribution and implied indemnity have

been subsumed by the doctrine of comparative fault in Tennessee.  The Court also need not consider

Morrison's motion for summary judgment, and that motion will be denied as moot.

## B. **Ohio Farmers' Motion for Summary Judgment**

In support of its motion for summary judgment, Ohio Farmers contends that the indemnity agreement is enforceable as to the payment and performance bonds issued on behalf of Special Coatings for the Hopkinsville project. As a result, Ohio Farmers claims it is entitled to: indemnity from Special Coatings and the Godwins for losses paid in the amount of $222,150.50, prejudgment interest on that amount, a deposit by the Godwins of $125,000 as collateral to secure potential future losses on the payment bond; and attorney's fees and expenses of litigation.

Ohio Farmers correctly argues that indemnity agreements are enforceable under Tennessee law, and like other contracts, they are to be enforced according to their plain and unambiguous terms. National Surety Corp. v. Buckles, 219 S.W.2d 207, 208-209 (1949); Hardeman County Bank v. Stallings, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995). The indemnity agreement at issue here, in the second paragraph, expressly and unambiguously set forth the extent of the indemnity and the agreement provided, in the twenty-fifth paragraph, that the agreement applied to *any* bonds that Ohio Farmers issued on behalf of the indemnitors or any one of them over an indefinite period of years until the agreement is cancelled in accordance with its terms. (Docket Entry No. 83-1, Agreement of Indemnity at 1, 4 & 5, capitalization in original). Ohio Farmers issued bonds on behalf of Special Coatings, which was specifically identified on the indemnity agreement as the corporate indemnitor, and Millard Godwin signed the indemnity agreement as Chief Manager of Special Coatings. The ninth paragraph of the indemnity agreement provides that the indemnitors' liability is not affected by the failure of the principal to sign a bond; thus, the fact that Millard did not sign the payment and performance bonds for the Hopkinsville job does not relieve the Godwins

29

of liability under the indemnity agreement.

The twenty-third paragraph of the indemnity agreement states unequivocally that the agreement may be terminated by the indemnitors by sending a written notice by certified mail to the surety at the address provided in the agreement, but the same paragraph also makes clear that any such termination will not operate to modify, bar, or discharge the indemnitors as to any bonds that had already been executed. Further, that paragraph provides that notice of termination operates only with respect to those who sign the notice of termination.

Under Tennessee law, the Godwins are charged with knowledge of these contractual provisions of the indemnity agreement, despite their claims that they relied on Morrison and did not read the indemnity agreement before they signed it, and despite Casey's assertion that she directed Morrison to remove her from the indemnity agreement. An indemnitor cannot avoid the consequences of an indemnity agreement by claiming he did not read the document. National Surety Corp., 219 S.W.2d at 209. "'It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written.'" Giles v. Allstate Ins. Co., 871 S.W.2d 154, 157 (Tenn. Ct. App. 1993) (quoted case omitted); Solomon v. First Am. Nat'l Bank of Nashville, 774 S.W.2d 935, 943-944 (Tenn. Ct. App. 1989) ("'Ordinarily, one having the ability and opportunity to inform himself of the contents of a writing before he executes it will not be allowed to avoid it by showing that he was ignorant of its contents or that he failed to read it.'"); Bowman v. Waggoner, 2006 WL 140377 at * (Tenn. Ct. App. Jan. 17, 2006) (holding plaintiff failed to establish fraud claim where he claimed to rely on representations of another before signing contract but failed to show his reliance was reasonable and

30

failed to read contract himself); <u>Moore v. Progressive Sav. Bank</u>, 211 F.3d 1269 (Table), 2000 WL 420675 at *4 (6th Cir. Apr. 10, 2000) (holding plaintiff could not establish fraudulent inducement claim where she had the opportunity to read a bank note before signing it but did not do so).

It is undisputed the indemnity agreement was not terminated according to its express terms. The Godwins admitted they did not at any time send written notice by certified mail to Ohio Farmers stating that one or both of them wished to terminate their individual liability under the indemnity agreement, nor did Millard send a written notice by certified mail to Ohio Farmers to terminate the indemnity agreement as to Special Coatings while he was the sole owner of the business. Ohio Farmers issued the bid bond on the Hopkinsville project at a time when Millard still owned Special Coatings. In fact, the work agreement Millard and Russell signed on the same day the bid bond was issued, February 9, 2006, stated that Special Coatings agreed to obtain performance and payment bonds to secure projects on which Russell would be employed.

The Godwins' defense to liability is four-pronged: first, that Special Coatings and the Godwins did not make application for the bonds for the Hopkinsville project; second, Morrison's faxed letter to the surety underwriters attaching Millard's agreement assigning all ownership rights in Special Coatings to Russell was intended to release the Godwins as individual indemnitors and terminate the indemnity agreement, yet the bonds were issued in direct contravention of Casey's clear instructions on January 13, 2006, not to issue any bonds for Hopkinsville; third, because of the significant change to Special Coatings as a result of the sale, the Godwins were relieved from liability; and fourth, Morrison's negligence in his dealings with the Godwins is imputed to Ohio Farmers and Ohio Farmers cannot be indemnified for its own negligence.

*1. The Godwins did not apply for bonds*

31

The second paragraph of the indemnity agreement, appearing in the preamble to the contract, states in pertinent part: "WHEREAS, in the transaction of business . . . bonds . . . may be . . . required . . . on behalf of the indemnitors, and application . . . will . . . be made to the Surety to execute such bonds[.]"  The Godwins contend that the submission of an application for a bond was a condition precedent to the issuance of a bond.  According to the Godwins, there is no documentary evidence that they applied for bonds for the Hopkinsville project.  Instead, Russell and Ridenour applied to get bonding for that job, and Ohio Farmers proceeded at its own risk without any application for bonding from Millard.  Further, because Casey informed Ohio Farmers' agent, Morrison, that no more bonds should be issued, Ohio Farmers was advised there would be no future bonds.  The Godwins cite <u>Jones Masonry, Inc. v. West Am. Ins. Co.</u>, 768 S.W.2d 686 (Tenn. Ct. App. 1988), in support of their argument that the indemnity agreement's preamble established a condition precedent to issuance of bonds, but the Court concludes the case is inapposite.

In <u>Jones Masonry</u>, a masonry construction company carried a liability policy with West American.  <u>Id.</u> at 686.  Jones Masonry was the subcontractor to a general contractor building a church in Shelby County, Tennessee.  <u>Id.</u>  During bricklaying for the church, mortar splashed on windows and window frames.  Jones Masonry employees were on the work site cleaning the brick. The superintendent for the general contractor directed the employees to clean the windows and frames as well.  The employees did as they were told, but the cleaning solution damaged the windows and window frames.  The general contractor replaced the damaged windows and frames and held the cost out of Jones Masonry's retainage for satisfactory completion of the brickwork. Jones Masonry sought reimbursement from West American, but the insurer refused to pay. Construing the operative contract language, the Tennessee Court of Appeals held there was no

coverage because the insurer agreed to pay sums which the insured "shall become legally obligated to pay" and the policy included an express condition that the insured's obligation to pay had to be "finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company." Id. at 687. Because there had been no judgment rendered against Jones Masonry, West American did not have to pay.

The case is not helpful to the Court because the case does not address the effect of language found in a preamble to a contract, which is the situation here. Ohio Farmers contends that the language concerning making application for bonds is found in the preamble of the indemnity agreement, and that a preamble is used to describe the purposes of the contract, rather than to state specifically the consideration or conditions of the contract, citing S.M. Williamson & Co. v. Ragsdale, 95 S.W.2d 922, 924-925 (Tenn. 1936). The Sixth Circuit made a similar observation in Cain Restaurant Co. v. Carrols Corp., 273 Fed.Appx. 430, 434 (6th Cir. 2008), when it stated that "preambles in a contract generally serve to introduce the contract's subject matter rather than set forth the specific rights and obligations of the parties." The court further observed: "In light of a preamble's purpose in a contract, we recognize that provisions in a preamble, like recitals or other prefatory provisions of a contract, do not necessarily control over provisions in the operative sections." Id. The court cited cases holding that the operative portion of the contract prevails over a preliminary recital or preamble, and quoted Berg v. Berg, 275 N.W.836, 842 (Minn. 1937), for the proposition that "in contracts where a preamble . . . is . . . declaratory of the purposes and intentions of the parties, it will be looked to in construing the contract . . . but in no sense will it be the basis of a legal and binding obligation of the parties." Id.

Construing the indemnity agreement as a whole, the Court concludes as a matter of law that

the preamble introduced the indemnity agreement's subject matter, and did not state any particular condition of the contract that was required to be met before bonds could issue. The parties executed the indemnity agreement because they expected that surety bonds would be requested from Ohio Farmers from time to time. The operative language of the indemnity agreement does not include any specific provision requiring a written application before bonds could issue. Moreover, the record evidence shows that Millard's previous practice to obtain bonds on behalf of Special Coatings for the Tullahoma and Rome jobs was to make a verbal request, and the Godwins do not now argue that those bonds were invalid for lack of a written application. Accordingly, the Court concludes that this issue is not effective opposition to the summary judgment motion.

### 2. *Ohio Farmers' knowledge of the sale of Special Coatings to Russell*

The Godwins next claim that an indemnity agreement may be terminated when the indemnitor notifies the surety that it no longer wishes to be an indemnitor despite specific termination provisions in the indemnity agreement. They contend that a reasonable juror could conclude the March 6, 2006 fax from Morrison to Ohio Farmers' bond manager, McClanahan, stating, "we both know there needs to be some agreements changed prior to releasing any final bonds[,]" and attaching a copy of Millard's ownership assignment agreement to Russell, was a termination of the indemnity agreement. The Godwins contend there are genuine issues of material fact on this issue because both Morrison and the receiver of the fax, underwriter Basch, understood that the fax meant the indemnity agreement must be changed, even though McClanahan claimed he did not know to which agreements the fax referred. The Godwins represent that McClanahan testified "[i]t is customary for Ohio Farmers Insurance Company to terminate indemnity agreements when the bond manager is notified[,]" and for this statement the Godwins cite page 79 of

34

McClanahan's deposition. No such statement by McClanahan is made on page 79 of his deposition. The Court has scoured the excerpts of McClanahan's testimony provided in the record, and the Court cannot find any such reference. Thus, there is no evidence before the Court that McClanahan testified it is customary for Ohio Farmers to terminate an indemnity agreement when the bond manager is notified.

The Godwins were unable to locate any Tennessee cases supporting their argument that an indemnity agreement can be terminated by notifying the surety of termination by some method other than that specified in the written indemnity agreement. The Godwins cite three cases from other jurisdictions. They primarily rely on <u>Fidelity and Deposit Co. of Maryland v. Tom Murphy Constr. Co.</u>, 674 F.2d 880, 884 (11th Cir. 1982), where the Eleventh Circuit held, construing Florida law, that "[a] written contract or agreement may be altered or modified by an oral agreement if the latter has been accepted and acted upon by the parties in such manner as would work a fraud on either party to refuse to enforce it."

An important point in <u>Fidelity and Deposit Co.</u> that the Godwins do not mention is there the court agreed with Fidelity and Deposit that "oral modifications are effective despite prohibitive language in the contract only where clear and unequivocal evidence of a mutual agreement is presented." <u>Id.</u> at 887. In that case, the court acknowledged there were issues of fact about whether a mutual agreement to terminate was reached where the indemnitor informed the surety's agent that he would no longer be liable for performance bonds issued on behalf of a construction company, and the agent assured the indemnitor he would take care of the situation so that there would be no liability. Under such facts, the Eleventh Circuit ruled that the indemnitor was entitled to present evidence to establish if and when the conversation took place, and if it did, what exactly was agreed.

35

Id. at 885.

There is no allegation, let alone evidence, in this case that Morrison had a conversation with Millard in which Morrison assured Millard that he would take action to terminate the Godwins' individual liability under the indemnity agreement because Millard had assigned his ownership rights in Special Coatings to Russell. Importantly, even though the Godwins argue that *they* provided the Special Coatings assignment contract to Morrison and asked him to send it to Ohio Farmers (Docket Entry No. 87 at 15 ("the Godwins' intent in sending a written copy of the agreement with the fax cover page to Mr. Basch was to provide notice to Ohio Farmers'"), at 16 ("the Godwins sent notice of their intent to terminate the indemnity agreement."), at 16 ("As a result of sending the contract, the Godwins justifiably believed they were relieved from further obligations related to the indemnity."), at 16 ("the Godwins' fax"), Millard testified he did not provide the assignment agreement to Morrison, Russell did. (Docket Entry No. 80-1, Millard Godwin Depo. at 102.) Millard testified that Russell gave the assignment agreement to Morrison to show he owned Special Coatings and to get insurance. (Id.) Millard did not testify that he provided the agreement to Morrison with the intent that Morrison and Ohio Farmers would terminate the indemnity agreement. Even taking as true Casey's testimony that she directed Morrison to remove her name from the indemnity agreement on January 13, 2006, there is no evidence that Morrison promised Casey that he would take action to remove her name from the indemnity agreement. Rather, the evidence shows that no bonds had been requested or issued for the Hopkinsville project at that time, and Morrison informed Casey that she and Millard were still liable under the indemnity agreement to complete the Rome, Georgia job in a satisfactory manner. There is no evidence that Casey renewed a request, either in writing or verbally, to Morrison to remove her name from the indemnity

36

agreement after February 25, 2006, before the final bonds were written for Hopkinsville, but after Millard sold Special Coatings to Russell.

Further, even drawing reasonable inferences from Morrison's fax to Basch and McClanahan on March 6, 2006, and from these individuals' testimony that all three of them knew Millard's sale of Special Coatings to Russell could mean the Godwins no longer wanted to be held liable under the indemnity agreement, the Godwins have not presented any evidence, let alone clear and unequivocal evidence, to generate a genuine issue of material fact for trial on whether there was a mutual agreement between the Godwins and Ohio Farmers to terminate the indemnity agreement. See id. at 885.

The Godwins also rely on Reliance Ins. Co. v. Jack's Constr. Co., 360 So.2d 292 (Ala. 1978), but there, too, the surety's agent made an explicit statement to the indemnitors, who requested release from an indemnity agreement, that "he 'saw no reason' why they should continue as indemnitors." Id. at 293. Because the agent made this express statement to the indemnitors, the Alabama Supreme Court upheld the trial court's decision that the agent, acting as the general bonding agent for the surety, released the indemnitors from the indemnity agreement. The Godwins produce no evidence that Morrison made a similar statement to them that could be construed as releasing them from the indemnity agreement.

Finally, the Godwins rely on National Union Fire Ins. Co. v. Studer Tractor and Equip. Co., 527 P.2d 820 (Wyo. 1974). That case, too, is distinguishable on its facts. There, Studer signed an indemnity agreement on behalf of Kelley so that Kelley could bid on four small reclamation projects. Kelley did not get any of the jobs. When Studer contacted the agent for the surety, National Union, the agent told Studer that Kelley no longer did business with them, he had cancelled any insurance

37

policies taken out, and the file had been closed. The agent did not tell Studer that his indemnity agreement had been delivered to National Union. Thereafter, Studer agreed to help Kelley with certain other small jobs, but he specifically refused to stand behind a larger project. Nonetheless, Kelley won the bid on the large job and obtained bonding through a different agency representing National Union. The surety did not contact Studer, but issued the bonds backed by Studer's indemnity agreement without Studer's consent. At least once thereafter a bonding agent asked Studer if he would be willing to indemnify National Union for bonds it might write for Kelley and Studer refused. When Kelley defaulted, National Union sued Studer on the indemnity agreement. Id. at 822-824. The trial court found the indemnity agreement to be ambiguous as to what projects Studer agreed to indemnify. The Wyoming Supreme Court agreed, noting the indemnity agreement had numerous ambiguities, and therefore, parol evidence was permissible to explain which projects Studer intended to indemnify. Id. at 825. The court refused to interpret the agreement in such a way that National Union could issue any and all bonds for Kelley in perpetuity without further request from, or knowledge of Studer. Id.

Here, while the indemnity agreement applied to "whatever bonds . . . may be executed by the company on behalf of the indemnitors, or any one of them. . . from time to time, and over an indefinite period of years, until this agreement shall be canceled in accordance with the terms hereof[,]" (Docket Entry No. 83-1 at 5 (caps omitted)), the Godwins have not produced evidence that they lacked any knowledge whatsoever of the Hopkinsville payment and performance bonds issued on behalf of Special Coatings. Rather, Millard testified that he knew he was the sole owner of the company and the indemnity agreement was in force at the time the bid bond issued, and he wanted Russell and Ridenour to get the Hopkinsville job so he might make back some of his

investment. Millard also acknowledged that his agreement assigning Special Coatings to Russell was silent on whether his obligation under the indemnity agreement was terminated. Millard also knew Ohio Farmers was issuing the final bonds because he drove to Morrison's office to be present the day Ridenour picked up the bonds. Millard's knowledge under the circumstances of this case distinguishes the instant case from National Union Fire Ins. Co.

### 3. *Significant change to Special Coatings relieved Godwins of liability*

Next, the Godwins contend that the sale of Special Coatings to Russell caused a significant change to Special Coatings such that it altered the nature of the Godwins' indemnity and relieved them from further obligation as indemnitors. They cite *Corpus Juris Secundum* § 92:

> The major inquiry in determining whether a guarantor is released by changes in the principal entity is whether the changes have the effect of creating a principal with a new identity, the debts of which the guarantor never intended to guarantee when the agreement was executed. In order to release a guarantor the change in the entity must significantly alter the nature of the guarantor's undertaking and result in increased risk to the guarantor.

The Godwins note that the indemnity agreement recognized in paragraph 4 of the preamble that the Godwins "have a substantial, material and beneficial interest in the obtaining of the Bonds[.]" Yet, the March 6, 2006 fax from Morrison to McClanahan notified Ohio Farmers that Millard no longer had a "substantial, material and beneficial interest" in obtaining bonds. Additionally, the Godwins argue the indemnity agreement provided in the first paragraph that the indemnitors "will pay . . . all premiums . . . until the Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof." The Godwins contend that, by accepting premiums for the final bonds from Ridenour, Ohio Farmers was on notice that the corporate indemnitor had changed.

These contentions do not take into account all of the evidence in the record. Special

39

Coatings, a Tennessee limited liability company, was the corporate indemnitor on the bonds issued for the Hopkinsville job, whether owned by Millard or Russell. Millard's sale of Special Coatings to Russell did not change the fact that Millard was the sole owner of the company and the indemnity agreement was in force when the bid bond was issued on February 9, 2006. The sale agreement between Millard and Russell stated that Millard was responsible for all debts incurred for Special Coatings before February 25, 2006. Had the final bonds not been issued for the Hopkinsville job, Ohio Farmers would have been liable on the bid bond for $36,900. Ohio Farmers could have demanded that Millard pay that amount pursuant to the indemnity agreement, even accepting the Godwins' position that Ohio Farmers was on actual notice that Millard had sold Special Coatings to Russell. The sale agreement that Morrison provided by fax to Ohio Farmers expressly stated that Millard was responsible for prior debt. Therefore, Millard retained a "substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling said Bonds" even after the sale of Special Coatings to Russell. In light of Millard's testimony that he wanted Russell and Ridenour to get the Hopkinsville job so he could get paid back some of his investment, a reasonable jury could find that Millard also retained a "substantial, material and beneficial interest" in the final bonds that were necessary for the project to go forward at all.

The information available to Ohio Farmers did not show that Millard wanted to be released from his indemnity agreement. His sale agreement with Russell was silent on the issue of termination of the indemnity agreement. Millard conceded he never expressly requested release from the indemnity agreement.

Further, McClanahan received an email informing him that Ridenour, Russell and Millard were all going to be involved in the business together and they planned to set up a partnership

40

agreement, although he never saw one. Russell wrote a letter to Ohio Farmers claiming that Ridenour, Russell and Millard were equal partners in Special Coatings. Although Millard now denies he was involved in any partnership with Ridenour and Russell or that he knew about Russell's letter, the Godwins produce no evidence that Ohio Farmers knew Millard was not in partnership with Russell and Ridenour and proceeded to issue the final bonds against his indemnity agreement anyway. Even taking the Godwins' evidence as true, a jury could still find that McClanahan, Basch and Morrison reasonably concluded under the circumstances available to them at the time that Millard's financial strength backed any bonds issued on behalf of Special Coatings, no matter who actually owned the company.

The payment of the bond premiums does not evidence any significant change in Special Coatings. Morrison's account listed Special Coatings, not the Godwins, as the agency's "customer." (Docket Entry No. 96-22.) Special Coatings paid the premiums for the final bonds on the Hopkinsville job as it had done for previous jobs; the only difference was that Ridenour wrote the check. Millard conceded that he was at Morrison's office the day the final bonds were handed to Ridenour, but he did not look at the bonds, nor did he tell anyone at the Morrison agency that he was no longer liable for the bonds pursuant to the indemnity agreement. When all of the circumstances are considered, the Godwins have not generated a genuine issue of material fact for trial on whether a significant change to Special Coatings altered the nature of the Godwins' indemnity.

### 4. Ohio Farmers cannot be indemnified for its own negligence

Finally, the Godwins briefly assert that Morrison was negligent in his dealings with them, Morrison's negligence is imputed to Ohio Farmers, and thus, under <u>Eades v. Union Railway Co.</u>,

41

396 F.2d 798 (6th Cir. 1968), and <u>Brogdon v. Southern Railway Co.</u>, 384 F.2d 220 (6th Cir. 1967), Ohio Farmers cannot be indemnified for its own negligence. The Godwins adopt the facts and arguments they identified in opposition to Morrison's motion for summary judgment.

This issue turns on several subissues, including whether Morrison acted as the agent of Ohio Farmers, a point Ohio Farmers does not concede, and whether the Godwins can prove the elements of a negligence claim against Morrison. The Court has stated that the Godwins' Third Party Complaint against Morrison will be dismissed as not properly brought in this lawsuit under Rule 14. Consequently, Morrison's and the Godwins' briefs and evidence on the negligence issue are not properly before the Court for examination, and the Court will not reach these issues.

## IV. CONCLUSION

For all of the reasons stated, Plaintiff's Motion For Summary Judgment (Docket Entry No. 82) will be granted. Third Party Defendants William Morrison and Morrison & Fuson Insurance Agency, Inc's Motion to Dismiss for Failure to State a Claim (Docket Entry No. 68) will be granted. Third Party Defendants' Motion for Summary Judgment (Docket Entry No. 78) will be denied as moot.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

42